UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

24/7 CUSTOMER, INC., ET AL.,

       Plaintiffs,

   v.

LIVEPERSON, INC.,

       Defendant.

Case No.15-cv-02897-JST

**ORDER REGARDING MOTION FOR JUDGMENT ON THE PLEADINGS**

Re: ECF No. 126

Before the Court is Defendant LivePerson, Inc.'s ("LivePerson") motion for judgment on the pleadings under Rule 12(c). The Court will grant the motion in part and deny it in part.

## I.    BACKGROUND

On March 6, 2014, LivePerson filed suit against 24/7 Customer, Inc. ("24/7") in the Southern District of New York, asserting claims of trade secret misappropriation, unfair competition, and copyright infringement, among others. LivePerson, Inc. v. 24/7 Customer, Inc., No. 14-cv-01559-RWS (S.D.N.Y). 24/7 subsequently filed two lawsuits for patent infringement in this Court. See Case No. 15-cv-02897, ECF No. 1; Case No. 15-cv-05585, ECF No. 1. The Court consolidated the two cases in this district for pre-trial purposes. ECF No. 57. The case that originated in the Southern District of New York has since been transferred to this Court and deemed related to the two other actions. ECF Nos. 130, 133. The Court held Markman proceedings and issued its claim construction order on December 7, 2016. ECF No. 109. Pursuant to that order, one patent was invalidated for indefiniteness, leaving ten remaining patents. Id. at 4-6.

LivePerson moves for judgment on the pleadings for the Second Amended Complaint in Case No. 15-cv-02897 and the First Amended Complaint in Case No. 15-cv-05585 on the ground that the patents asserted by Plaintiffs are invalid because they claim ineligible subject matter. ECF

No. 126 at 7.

## II.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The analysis for Rule 12(c) motions for judgment on the pleadings is "substantially identical to [the] analysis under Rule 12(b)(6)...." Chavez v. United States, 683 F.3d 1102, 1108 (9th Cir. 2012) (quotations omitted). To evaluate a Rule 12(b)(6) motion to dismiss, the court accepts the material facts alleged in the complaint, together with reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). A plaintiff must allege facts that are enough to raise her right to relief "above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). A "judgment on the pleadings is properly granted when, taking all the allegations in the non-moving party's pleadings as true, the moving party is entitled to judgment as a matter of law." Fajardo v. Cty. of Los Angeles, 179 F.3d 698, 699 (9th Cir. 1999). "Finally, although Rule 12(c) does not mention leave to amend, courts have discretion both to grant a Rule 12(c) motion with leave to amend, and to simply grant dismissal of the action instead of entry of judgment." Lonberg v. City of Riverside, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004) (citations omitted).

## III.    DISCUSSION

### A. Patent-Eligible Subject Matter under Section 101

"Section 101 of the Patent Act defines the subject matter eligible for patent protection. It provides: 'Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.'" Alice Corp. Pty. V. CLS Bank Int'l, 134 S. Ct. 2347, 2354 (2014) (quoting 35 U.S.C. § 101).

Implied in this provision is the well-established principle that "abstract ideas are not patentable." Id. (quoting Association for Molecular Pathology v. Myriad Genetics, Inc., 133 S. Ct. 2107, 2116 (2013)). The rationale behind the exclusion of abstract ideas from patentable subject matter is "one of pre-emption." Id. Because "abstract ideas are the basic tools of scientific and technological work," "monopolization of those tools through the grant of a patent might tend to

2

United States District Court
Northern District of California

impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws." Id. (internal brackets and quotation marks omitted).

However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." Id. After all, "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" Id. (quoting Mayo Collaborative Servs. v. Prometheus Labs., Inc., 566 U.S. 66, 71 (2012)). Therefore, courts must distinguish between patents that claim abstract ideas, on the one hand, and patents "that claim patent-eligible applications of those concepts," on the other hand. Id. at 2355.

To do so, courts engage in a two-step analysis. First, the court must determine whether the claims at issue are "directed to an abstract idea." Id. at 2356-57. If so, the court must "consider the elements of each claim both individually and as an ordered combination" to determine "whether it contains an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." Id. at 2355, 2357 (internal quotation marks omitted) (quoting Mayo, 566 U.S. at 72-73, 78-79). In doing so, the court is essentially asking "whether the claims [] do more than simply instruct the practitioner to implement the abstract idea . . . " Id. at 2359. When engaging in this invalidity analysis, courts consider the claims in light of the specification. Amdocs (Israel) Ltd. v. Openet Telecom, Inc., 841 F.3d 1288, 1299 (Fed. Cir. 2016) (citing cases).

A district court may find a patent invalid under Section 101 at the pleading stage. See buySAFE, Inc. v. Google Inc., No 2013–1575, 2014 WL 4337771 (Fed. Cir. Sept. 3, 2014); Open Text S.A. v. Alfresco Software Ltd, No. 13-CV-04843-JD, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014) (citing cases).

**B. '876 Patent**

The '876 patent generally relates to a method for routing a call to a customer service representative at a call center based on information about the caller and the available representatives. ECF No. 126-3, Ex. 2. Claim 1 is representative and provides:

> A method for routing an incoming call to a customer service representative comprising the steps of:
>
> > identifying the caller of the incoming call;

3

> retrieving a profile on the caller;
>
> comparing the caller profile with stored customer service representative profiles to determine which customer service representatives are more qualified to handle the incoming call;
>
> ranking the customer service representatives that can best meet the caller's needs;
>
> routing the incoming call to a selected highest ranked customer service representative; and
>
> automatically updating, at the completion of the call, the caller profile and the selected customer service representative profile with information regarding the success of the call.

ECF No. 126-3, Ex. 2 at 8.[1]

Dependent claims 2 and 7 recite the additional step of "routing the incoming call to the next highest ranked customer service representative if the previously selected customer service representative is unavailable." Id.

Dependent claims 5 and 10 recite the additional step of "conducting a post-call survey, during the updating step, of at least one of said caller and said customer service representative in order to determine the success of the call." Id.

The '876 patent is directed to the abstract idea of routing a call to a customer service agent based on information about the caller. As a general matter, courts have invalidated claims that are "fundamentally directed to the abstract idea of connecting customers to call centers." Pragmatus Telecom, LLC v. Genesys Telecommunications Labs., Inc., 114 F. Supp. 3d 192, 200 (D. Del. 2015) ("At its essence, the claim is directed to the abstract idea of communication between a customer and a business using a call center, automated and obfuscated along the way using certain

---

[1] Claim 6 is identical in all respects except for one: It recites the additional step of "prompting the caller with a list of questions." See id. Therefore, the Court analyzes Claims 1 and 6 simultaneously. See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (explaining that a district court does not need to address each claim if a single claim is "representative" and "all the claims are substantially similar and linked to the same abstract idea")(internal quotations omitted). Although 24/7 argues that "LivePerson's analysis of 'representative' claims is inappropriate," 24/7 implicitly acknowledges that Claims 1 and 6 are substantially similar by collectively referring to those claims throughout their opposition. ECF No. 134 at 10-14 ("Claims 1 and 6 are directed to (1) call routing based on caller and CSR profile information, and (2) the use of automatically updated profile information to evaluate and improve call routing.").

4

computer, telephonic and network services.").  Although the '876 patent arguably differs in that it contemplates a method for routing a call to the customer service representative that is most likely to meet the particular caller's needs, that method is itself directed to an abstract idea: tailoring information to improve customer experience.  See Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1369 (Fed. Cir. 2015) (holding that claim "relate[d] to customizing information based on [] information known about the user" was directed to an abstract idea because "information tailoring is 'a fundamental . . . practice long prevalent in our system'") (quoting Alice, 134 S. Ct. at 2356); Open Text S.A. v. Alfresco Software Ltd, No. 13-CV-04843-JD, 2014 WL 4684429, at *4 (N.D. Cal. Sept. 19, 2014) (holding that claims were directed to abstract idea where they "describe[d] the most basic and widely-understood principle of marketing: identify potential or current customers and engage with them to improve their customer experience").

Notably, another court in this district recently held that a similar patent—which claimed a method for monitoring and adjusting routing options for sending a delivery receipt message—was "directed to selecting the best message routing option based on separately-transmitted feedback." Twilio, Inc. v. Telesign Corp., No. 16-CV-06925-LHK, 2017 WL 1374759, at *2, *15 (N.D. Cal. Apr. 17, 2017).  The court concluded that, because "[s]electing the best option based on separately-received feedback is a fundamental activity that has long been performed by humans," the patent was directed to an abstract idea.  Id. at *15.  The same is true here.

24/7 contends that "the claims of the '876 patent are directed to improving call routing by [1] comparing customer and CSR profiles and [2] automatically updating the profiles based on the success of the call to improve further customer routing."  ECF No. 134 at 11-12.  Accordingly, 24/7 argues that the claims are directed to a technological advancement to an existing technological process.  Id.

As a preliminary matter, arguments regarding improvements go to whether the claims contain an inventive concept, and are therefore better suited to the second step of the Alice inquiry.  See Pragmatus, 114 F. Supp. 3d at 200 (citing Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 715 (Fed. Cir. 2014)).

In any event, these arguments fail because the claims are not "directed to a specific improvement" or "to a specific implementation of a solution to a problem." Enfish, LLC v. Microsoft Corp., 822 F.3d 1327, 1338, 1339 (Fed. Cir. 2016) (emphases added). As the Federal Circuit recently explained, the relevant inquiry is "whether the claims in the patent focus on a *specific means or method*, or are instead directed to *a result or effect that itself is the abstract idea* and merely invokes generic process and machinery." Clarilogic, Inc. v. FormFree Holdings Corp., No. 2016-1781, 2017 WL 992528, at *2 (Fed. Cir. Mar. 15, 2017) (emphases added).

The claims of the '876 patent are directed to the latter and propose only a general, abstract solution to problems in the prior art. According to the specification, the prior art allowed customers to decide where to route their call, which "is often not adequate in identifying the customer's need and matching that need with the customer service representative most likely to satisfy that need." ECF No. 126-3 at 6, 1:44-46. To be sure, the claims of the '876 patent propose a general solution to this problem: route the customer's call for them by comparing the customer's needs to the representative's skills to ensure a better match. But, as explained above, this general solution amounts to nothing more than an abstract idea related to basic customer service. See Twilio, 2017 WL 1374759 at *19 (invalidating message routing patent that "specifie[d] at a high level of generality to carry out the abstract idea of selecting the best message routing option based on separately-transmitted feedback"). And "there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." Elec. Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1356 (Fed. Cir. 2016) (internal quotation marks omitted). Here, the claims do not provide for any specific implementation of this abstract idea—e.g., they do not specify the structure or content of the profiles, the technology that should be used to perform the comparison, or even how the profile information should be analyzed to achieve the proposed solution. Clarilogic, 2017 WL 992528 at *2 ("[A] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction."). Rather, they simply recite a generalized solution in broad, functional language— namely, "retrieving," "comparing," and "ranking" information about the customer and

representative.  See Electric Power, 830 F.3d at 1353-54 ("collecting," "gathering," "analyzing," and "presenting" information are "within the realm of abstract ideas"); Content Extraction, 776 F.3d at 1347 (affirming that "the claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected set, and 3) storing that recognized data in memory").  In other words, the claims "recite the *what* of the invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible application." TDE Petroleum Data Sols., Inc., v. AKM Enter., Inc., 657 F. App'x 991, 993 (Fed. Cir. 2016), cert. denied, No. 16-890, 2017 WL 176474 (U.S. Mar. 6, 2017) (emphases in original).  The Court therefore proceeds to step two.

None of the claim elements, when viewed individually or as an ordered combination, provide any inventive concept.  The steps of Claim 1 recite six functions: identifying the caller, retrieving a profile on the caller, comparing the caller profile with stored customer service representative profiles, ranking customer service representatives, routing the call, and automatically updating the profiles at the end of the call. ECF No. 126-3 at 8.  The first five steps represent "well-understood, routine, conventional activity" that was performed in the prior art. Ultramercial, 772 F.3d at 715.  Indeed, the specification admits that call centers retrieved information about customer preferences and routed calls to customer service representatives accordingly in the prior art. Id. at 1:16-1:60.  The final step—updating customer profiles—refers to basic data storage.  Concept Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known."); Twilio, 2017 WL 1374759 at *19 ("transmitting," "receiving," "updating," and "selecting" were all "routine, generic computer functions").  Dependent claims 5 and 10, which refer to "conducting a post-call survey, during the updating step," also fail to supply an inventive concept. ECF No. 126-3 at 8.  See Open Text, 2014 WL 4684429 at *4 ("asking a customer about his or her experience" is an abstract idea).  Even when viewed collectively, the claim elements simply recite the abstract idea of routing a call to the best matched customer service agent, and therefore fail to supply an inventive concept. Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be

7

significantly more than the abstract idea itself . . .").

Therefore, the Court grants the motion for judgment on the pleadings as to the invalidity of the '876 patent.

## C.   '586 and '552 Patents

The '586 and '552 patents generally relate to a method for routing a call to a customer service representative at a call center based on the caller's "modality"—i.e., the "communication mode used by the customer to communicate."  ECF No. 126-6 at 10, 11; ECF No. 126-9 at 2, 12.

Independent claim 1 of the '586 patent is representative and provides:

> A method for intelligently routing customer communications to an agent, comprising:
>
> > receiving a customer's request to initiate communications;
> >
> > identifying a modality of the requested communications;
> >
> > obtaining a profile of the customer;
> >
> > selecting one of a plurality of agent models for each of a plurality of agents to determine a best match, and establishing a communications connection between the customer and the best matched agent.

ECF No. 126-6 at 16.[2]

Independent claim 8 of the '586 patent provides:

> An apparatus for intelligently routing customer communications to an agent in a telecommunications environment, comprising:
>
> > at least one processor that receives a customer's request to initiate communications, identifies a modality of the requested communications, obtains a profile of the customer, selects one of a plurality of agent models for each of a plurality of agents, based upon the identified modality, compares the profile with the selected model for each of the plurality of agents to determine a best match, and establishes a communications connection between the customer and the best matched agent.

ECF No. 126-6 at 16.[3]

---

[2] Independent claim 1 of the '552 patent is substantially similar and both parties discuss these two patents simultaneously.  See ECF No. 126-9 at 17; ECF No. 126 at 16-19; ECF No. 134 at 14-17.

Independent claim 15 of the '586 patent provides:

> A computer readable medium that stores a program for intelligently routing customer communications to an agent, comprising:
>
> > a request receiving code segment that receives a customer's request to initiate communications;
> >
> > a modality identifying code segment that identifies a modality of the requested communications;
> >
> > a profile obtaining code segment that obtains a profile of the customer;
> >
> > an agent model selecting code segment that selects one of a plurality of agent models for each of a plurality of agents, based upon the identified modality;
> >
> > a comparison code segment that compares the profile with the selected model for each of the plurality of agents to determine a best match, and establishing a communications connection between the customer and the best matched agent.

ECF No. 126-6 at 17.[4]

Each of the three independent claims in the '586 patent and the '552 patent are directed to an abstract idea: routing a call to "the best matched agent" who can communicate with the customer using the customer's preferred mode of communication. Again, connecting a customer to a representative who can "engage with them to improve their customer experience" falls within the realm of abstract ideas. Open Text, 2014 WL 4684429 at *4; Pragmatus, 114 F. Supp. 3d at 200; Intellectual Ventures, 792 F.3d at 1369.

The Twilio court held that a similar patent was directed to the abstract idea of "enabling multi-modal communication by looking up and selecting one or more external communication provider(s) associated with a communication destination." Twilio, 2017 WL 1374759 at *21-22. The court concluded that this was "fundamental human activity," citing the following example for support:

> [W]hen a user creates an account with a business . . ., he will often

---

[3] Independent claim 9 of the '552 patent is substantially similar. See ECF No. 126-9 at 17.
[4] Independent claim 15 of the '552 patent is substantially similar. See ECF No. 126-9 at 17.

indicate the ways in which the business is allowed to contact him (e.g., text, email, phone calls, physical mailings, etc.). Then, when the business wishes to contact the user about a new promotion or service, it will look up which forms of communication to which the user has agreed, and choose to send the promotional information in one or several of those ways.

Id.  That is precisely the sort of basic human activity that the '586 and '552 patents are directed to.

24/7 responds by pointing to three purported improvements over the prior art: "(1) a *plurality* of agent models for *each* of a plurality of agents; (2) the selection of an agent model for each agent based on a *modality* of the communication; and then (3) a comparison of a customer profile with the selected model for each of the plurality of agents."  ECF No. 134 at 14 (emphasis in original).  Based on these improvements, 24/7 argues that "the claims of the '586 and '552 Patents are directed to a specific arrangement of steps that identify *how* to route a customer call more effectively . . ."  Id. (emphasis in original).  The argument is not persuasive.

The independent claims are "directed to a result or effect"—namely, modality-based routing—but they lack any "specific means or method" for how to achieve that goal.  Clarilogic, 2017 WL 992528 at *2.  The specifications of the '586 patent and the '552 patent describe the problem in the prior art as follows:

A multi-modal service center, that can receive and process requests from clients or customers using multiple communications modalities, needs to recognize the differences in an agent's capability to receive and process requests for different modalities. Accordingly, there is a need for a multi-modal service center to incorporate into the modeling the differences in the modalities with which the service center can be contacted.  Furthermore, there is a need to incorporate into the modeling the difference in the modalities with which a single agent can be contacted.

ECF No. 126-6 at 10, 1:55-65; ECF No. 126-9 at 11, 1:58-67.  But, rather than "patenting a particular concrete solution to [this] problem," the claims "attempt[] to patent the abstract idea of a solution to the problem in general."  Electric Power, 830 F.3d at 1356.  The independent claims broadly speak to identifying the customer's mode of communication, obtaining unspecified information about the customer, and routing the customer to "the best matched agent."  However, *any* potential solution to the problem identified in the prior art—i.e., the need to consider mode of

communication when routing a customer communication to an agent—would involve identifying the caller's mode of communication and routing the call to an agent who uses the same form of communication as the customer. Critically, the claims do not explain *how* to "identify[] a modality of the requested communications" or *how* to "determine a best match." ECF No. 126-6 at 16. Again, the claims "recite the *what* of the invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible application." <u>TDE Petroleum Data</u>, 657 F. App'x at 993 (emphases in original).

Turning to step 2 of the <u>Alice</u> inquiry, the Court concludes that independent claim 1 of the '586 patent and independent claim 1 of the '552 patent lack any inventive concept that would transform the abstract idea into a patent-eligible application. Most of the individual elements—receiving a customer communication, obtaining a customer profile, comparing the customer profile to agent profiles, and connecting the customer to the "best matched agent"—describe "well-understood, routine, conventional activity" that was performed in the prior art. <u>Ultramercial</u>, 772 F.3d at 715. Indeed, both the '586 and '552 patents admit that multi-modal call centers, agent models, customer models, and the comparison of agent models and customer models "to determine a best-matched agent" were all known in the prior art. <u>See</u> ECF No. 126-9 at 11, 1:30-62, 9:5-15; ECF No. 126-6 at 10, 1:26-65, 9:28-32. The patents further acknowledge that "[a] conventional service center may process telephone requests by routing the client or customer to a best-matched agent" and that "models have conventionally been used to route calls for clients or customers using conventional telephones to contact an agent using a conventional telephone or telephone headset at the service center." <u>Id.</u> Given the existence of both multi-modal call centers and agent models in the prior art, the claims' description of multiple agent models for each agent does not supply an inventive concept, either. The only remaining element is the identification of the customer's mode of communication but, as explained above, that step is described in generic terms that merely recite the abstract idea itself without any specific method of implementation. <u>Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC</u>, 827 F.3d 1341, 1349 (Fed. Cir. 2016) ("An inventive concept that transforms the abstract idea into a patent-eligible invention must be significantly more than the abstract idea itself . . .").

Lacking an inventive concept in each of the three alleged improvements, 24/7 next argues that "[t]he inventive concept is the ordered combination of the claim elements that allow for greater customization." ECF No. 134 at 15-16. To support this argument, 24/7 relies on the Federal Circuit's decision in Bascom. See id.

Even when viewed collectively, however, the claim steps "simply instruct the practitioner to implement the abstract idea"—i.e., modality-based routing—"with routine conventional activity." Ultramercial, 772 F.3d at 715. As discussed at length above, the claims do not provide any specific method of implementation or otherwise explain *how* to achieve purported improvements, but rather just recite the abstract idea of modality-based routing itself. As a result, they fail to supply an inventive concept and raise significant preemption concerns. Indeed, 24/7 effectively concedes that the claims cover all modality-based routing—i.e., any situation in which a service center routes an incoming customer communication to an agent based on the agent's ability to communicate using the customer's mode of communication. See ECF No. 134 at 16. The only exception to preemption that 24/7 can identify is modality-based routing that "does not involve the use of a plurality of agent models for each of a plurality of agents," and this limitation is extremely narrow given the existence of both multi-modal call centers and agent models in the prior art. Id.

These general, result-driven claims stand in stark contrast to the claims at issue in Bascom, which "recite[d] a specific, discrete implementation of the abstract idea of filtering content." Bascom, 827 F.3d at 1350-51. To accomplish the alleged improvement of "individually customizable filtering," the claims at issue in Boscom instructed the practitioner to physically install the filtering system at the Internet Service Providers' ("ISP") server. Id. at 1344-45. For example, one of the claims described, in part, "a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements." Id. at 1345. This was a deviation from the prior art, which had installed the filtering system on local computers, local

servers, and remote servers.  Id.  The court therefore concluded that "[t]he inventive concept described and claimed . . . is the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user."  Id. at 1350.  By describing a specific method for how to achieve the alleged inventive concept—the "how" of the invention—the claims at issue in Bascom avoided the invalidity issues faced by 24/7.

The remaining independent claims[5] fare no better because they merely recite the same abstract idea as applied to an "apparatus" with "at least one processor" (i.e., a generic computer) and a "computer readable medium that stores a program" (i.e., a software program).  ECF No. 126-9 at 17; ECF No. 126-6 at 16, 17.  However, "implementing an abstract concept on a computer, without meaningful limitations to that concept, does not transform a patent-ineligible claim into a patent-eligible one."  Accenture Glob. Servs., GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1345 (Fed. Cir. 2013) (citing Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), 687 F.3d 1266, 1280 (Fed. Cir. 2012)). The same principle applies to claims that "only contain generalized software components arranged to implement an abstract concept on a computer."  Id. at 1345.  Citing earlier cases, the Supreme Court reaffirmed in Alice that "[s]tating an abstract idea 'while adding the words "apply it"' is not enough for patent eligibility."  Alice, 134 S. Ct. at 2357-58 (quoting Mayo, 132 S. Ct. at 1294).  "Nor is limiting the use of an abstract idea '"to a particular technological environment."'  Id. (quoting In re Bilski, 545 F.3d 943, 957 (Fed. Cir. 2008)).  Accordingly, "[s]tating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result."  Id.  Moreover, "wholly generic computer implementation is not generally the sort of 'additional feature[]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'"  Id.  Therefore, the remaining independent claims similarly lack an inventive concept that would transform the abstract idea into a patent-eligible application.

24/7 completely fails to address LivePerson's assertion that the dependent claims are also invalid, and therefore the Court does not address the issue at length.  See ECF No. 126 at 18; ECF

---

[5] The Court refers to independent claims 8 and 15 of the '586 patent, and independent claims 9 and 15 of the '552 patent.

No. 134 at 14-17; <u>Linder v. Golden Gate Bridge, Highway & Transportation Dist.</u>, No. 4:14-CV-03861 SC, 2015 WL 4623710, at *3 (N.D. Cal. Aug. 3, 2015) (citing <u>Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.</u>, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.")).  In any event, the dependent claims are invalid for the same reasons because they are "substantially similar and linked to the same abstract idea."  <u>Content Extraction</u>, 776 F.3d at 1348 (finding 242 claims invalid based on analysis of just one independent claim, where the dependent claims "recite[d] little more than the same abstract idea").

The Court grants Defendant's motion for judgment on the pleadings as to the invalidity of the '586 and '552 patents.

### D. '757 Patent[6]

The '757 patent generally relates to a method to provide automated scripting for customer service representatives.  ECF No. 126-7 at 10.

Claim 1 provides:

> A method comprising:
>
>> obtaining information identifying a first party in conjunction with a communication between a first party and a first party service representative (CSR);
>>
>> obtaining content related to the identified first party;
>>
>> generating a script based, at least in part, on the obtained content; and
>>
>> displaying the generated script to the CSR while the communication is still in progress.

<u>Id.</u> at 14.  Dependent claim 2 comprises the method of claim 1 and "concurrently displaying content from at least two different databases and the generated script using a consolidated interface."  <u>Id.</u>  Dependent claim 3 comprises the method of claim 1, "wherein displaying the

---

[6] The Court grants 24/7's objections to new evidence and arguments raised in LivePerson's reply. ECF No. 136.  Accordingly, the Court strikes Exhibit 12 to LivePerson's reply and all related arguments.

generated script further comprises: displaying links to content stored in at least one of a plurality of different databases." Id. Dependent claim 5 comprises the method of claim 1, "wherein generating the script further comprises: maintaining a macro glossary defining associations between identifiers and replacement text." Id.

Independent claim 7 provides:

> An information handling system comprising:
>
> > at least one processor;
> >
> > memory operably coupled to said at least one processor; and
> >
> > a program of instructions capable of being stored in said memory and executed by said processor, said program of instructions configured to execute a method comprising:
> >
> > > obtaining information identifying a first party during a communication between a first party and a first party service representative (CSR);
> > >
> > > obtaining content related to the identified first party;
> > >
> > > generating a script based, at least in part, on the obtained content; and
> > >
> > > displaying the generated script to the CSR while the communication is still in progress.

Id.

Independent claim 13 provides:

> A computer readable medium tangibly embodying a program of executable instructions, the program of executable instructions comprising:
>
> > a live interface module to retrieve information pertaining to a first party in conjunction with a communication between the first party and a customer service representative (CSR);
> >
> > a page generator to generate pages based on the retrieved information and display the pages to the CSR, wherein the pages include a script suitable for being read to the first party by the CSR.

Id.

In KomBea Corp. v. Noguar L.C., a district court addressed the validity of similar patents that "generally pertain[ed] to a telemarketing system that allows an agent to use prerecorded

scripts, live voice, and interjections during a telemarketing call to tailor the call to potential customers . . ." 73 F. Supp. 3d 1348, 1349 (D. Utah 2014), aff'd, 656 F. App'x 1022 (Fed. Cir. 2016). In particular, one of the patents at issue "relate[d] to a method of using personal information gathered in the call to select scripts that relate to the potential customer." Id. The court held that "the concepts contemplated by the patents-in-suit are directed toward basic sales techniques executed with the aid of a computer to create efficiencies." Id. at 1352. The court went on to explain that "[a]llowing a telemarketing sales agent to choose between scripts to make a sales call more effective is a basic, time-honored sales technique." Id. The court further held that tailoring the script by referencing personal information about the customer obtained earlier in the call was similarly "directed to an abstract idea that is fundamental in sales—making a personal connection with a potential customer to make the call more effective." Id. at 1353. Proceeding to step two in the Alice inquiry, the court concluded that the claims did not contain an inventive concept sufficient to transform this abstract idea into a patent eligible invention. Id. at 1356-57. The court reasoned that, although the use of prerecorded scripts and the incorporation of personal information "may be a more effective sales technique, it is ultimately a method organizing the behavior of a telemarketing sales agent." Id. at 1357. Because the patents boiled down to "a set of instructions to implement fundamental sales techniques with the aid of a computer," the court concluded that they were invalid. Id.

The claims in the '757 patent are invalid for the same reasons.

First, they are similarly directed to the abstract idea of tailoring a script to a particular customer to make a customer service call more effective. This is a "fundamental economic practice long prevalent in our system of commerce." Bilski, 561 U.S. at 611-12.

Second, the elements of the claims, when viewed individually and as an ordered combination, do not contain any inventive concept. The first few steps—identifying a customer and obtaining information about them—describe routine, conventional activity that was performed in the prior art. As the specification acknowledges, representatives already "retrieve[d] account data for the customer" in the prior art. ECF No. 126-7 at 10, 1:40-43. And this kind of generalized data collection is "well-understood, routine, conventional activity" that is not

16

sufficient to transform the abstract idea into a patent-eligible application.  Ultramercial, 772 F.3d at 715-16; Concept Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.").  The next claim element—"generating a script based, at least in part, on the obtained content"—is "not limited to how the collected information is analyzed or reformed," and is therefore similarly abstract.  ECF No. 126-7 at 14; Clarilogic, 2017 WL 992528 at *2 ("[A] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, is the height of abstraction.").  Moreover, the specification admits that customer service representatives were previously provided with "contact strategy documents," or a "CSR script," in paper form "to be used for guidance when handling customer calls."  ECF No. 126-7 at 10, 1:28-37.  As a result, the final claim element—"displaying the generated script to the CSR while the communication is still in progress"—also fails to supply an inventive concept.  ECF No. 126-7 at 14.  Even when viewed collectively, the claim elements "do not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology."  Electric Power, 830 F.3d at 1351. And independent claims 7 and 13 simply apply the abstract idea in claim 1 using generic computer equipment.  See, e.g., Content Extraction, 776 F.3d at 1348 ("There is no 'inventive concept' in CET's use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry.").

24/7 argues that KomBea is distinguishable because the '757 patent "improves the functionality of such scripts by integrating content from multiple sources, and automatically generating and displaying a script after filtering the available information to select the most relevant information."  ECF No. 134 at 18.  In doing so, however, 24/7 effectively admits that the '757 patent simply automates a process that was already performed in the prior art.  This is confirmed by the specification, which states that the purpose of the "dynamic page generating system," or "DPGS," is to "reduce the mental effort and demands for memorization required of the CSR."  ECF No. 126-7 at 10, 2:65-66.  Indeed, the specification identifies the key problem in the

prior art as "overwhelmed CSRs," who "navigate through the enterprise application screens in an inefficient manner" because they are required to exercise "significant mental effort" to "memoriz[e] [] considerable amounts of information." Id. at 10, 1:53-62. However, this increase in efficiency through "automation of a process using a computer is [] insufficient to save the asserted claims from abstractness." Papst Licensing GmbH & Co. KG v. Xilinx Inc., 193 F. Supp. 3d 1069, 1090 (N.D. Cal. 2016).

The KomBea court rejected a similar efficiency argument, noting that "the fact that Defendant's patents-in-suit are directed toward abstract ideas that are more efficiently executed with the use of a generic computer does not make the patents eligible for protection." KomBea, 73 F. Supp. 3d at 1357; see also, Bancorp, 687 F.3d at 1278 ("[T]he fact that the [abstract idea] could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter."). The KomBea court ultimately concluded that "the patents-in-suit are not a new solution to a unique problem; they only employ a combination of sales techniques and basic telemarketing technology to create an efficient system." KomBea, 73 F. Supp. 3d at 1354. The same is true here.

Because the '757 patent simply automates a process that was already performed mentally by CSRs in the prior art, 24/7's reliance on the Federal Circuit's decision in McRO, Inc. v. Bandai Namco Games Am. Inc., 837 F.3d 1299 (Fed. Cir. 2016), is misplaced. ECF No. 134 at 18. In that case, the computer was "employed to perform *a distinct process* to automate a task previously performed by humans," and the court distinguished cases in which "the claimed computer-automated process and the prior method were carried out in the same way." Id. at 1314-15 (emphasis added). The specification of the '757 patent admits that customer service representatives already performed the same process—i.e., they looked to multiple sources to tailor communications to the customer. ECF No. 126-7 at 10, 1:38-52 (describing how CSRs "interact[ed] with various screens from an enterprise system" to "retrieve account data for the customer, data about the company's goods and services, etc."). In other words, the '757 patent simply contemplates automation of the same process that was already performed by customer service representatives in the prior art. As explained above, that is not enough to confer patent-

eligibility.

The Federal Circuit's decision in <u>Amdocs</u> is likewise inapposite. The claims at issue in <u>Amdocs</u> contained an inventive concept because they provided "an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem . . ." <u>Amdocs</u>, 841 F.3d at 1300. In that case, the "inventive concept"—correlating information from two sources "to enhance" an accounting record—was "dependent upon the invention's distributed architecture." <u>Id.</u> In turn, the "distributed architecture . . . minimize[d] the impact on network and system resources" and "reduc[ed] congestion in network bottlenecks, while still allowing data to be accessible from a central location." <u>Id.</u> at 1291-92. "This distributed enhancement was a critical advancement over the prior art," in which "all the network information flow[ed] to one location, making it very difficult to keep up with the massive record flows from the network devices and requiring huge databases." <u>Id.</u> at 1300. In other words, the claims at issue "[did] not merely combine the components in a generic manner, but instead purposefully arrange[d] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks." <u>Id.</u> at 1301. In contrast, the claims of the '757 patent are "not tied to any particularized structure, broadly preempt[] related technologies, and merely involve[] combining data in an ordinary manner without any inventive concept." <u>Id.</u>

The dependent claims also lack any inventive concept. They describe generic computer elements and conventional activities—namely, "concurrently displaying content from at least two different databases," "displaying links to content stored in at least one of a plurality of different databases," and "maintaining a macro glossary . . ." ECF No. 126-7 at 14. These elements fail to transform the abstract idea into a patent-eligible application.

The claims of the '757 patent also broadly preempt any technology that automatically generates and displays customer service representative scripts based on information about the customer. Again, instead of articulating "a particular concrete solution" that would reduce a representative's need to memorize information and reference various materials simultaneously, these claims "attempt[] to patent the abstract idea of a solution to the problem in general" by simply automating that process in highly generalized language. <u>Electric Power</u>, 830 F.3d at 1356.

The Court grants the motion for judgment on the pleadings as to the invalidity of the '757 patent.

**E.  '553 Patent**

According to 24/7, "[t]he claims of the '553, '719, and '715 patents recite the conversion of telephonic voice calls to chat communications."  ECF No. 134 at 20.[7]

Claim 1 of the '553 patent provides:

> A method for converting a voice call attempt to an alternate medium for a real-time communication session, comprising:
>
> receiving a telephone call request;
>
> checking for accessibility of a called party chat client associated with a called party; and
>
> prompting a calling party to choose whether or not to electronically chat with the called party in an electronic chat session when the called party chat client is accessible, wherein the electronic chat session is enabled between a calling party chat client and the called party chat client that are logged into respective electronic chat servers.

ECF No. 126-4 at 15.  Dependent claim 2 recites the same method in claim 1, further comprising "sending an invitation to the called party, inviting initiation of a chat session with the calling party when the calling party chooses to chat."  Id.  Dependent claim 3 comprises the same method in claim 1 with the additional step of "connecting a voice call when the calling party chooses not to chat."  Id.  Independent claim 33 of the '552 patent performs the same steps on "[a] computer-readable medium having a program for converting a voice call attempt to an alternate medium for a real-time communication session."  Id. at 16.  Dependent claims 34 and 35 recite the medium of claim 33, further comprising the steps of sending a chat invitation when the calling party chooses to chat and connecting a voice call when the calling party chooses not to chat, respectively.  Id.

These claims are directed to the abstract idea of allowing a party to a phone call to select between voice call and electronic chat.  24/7 argues that this patent "improves communications by

---

[7] Although LivePerson also moved to dismiss the '719 and '715 patents on the same ground, the parties have since agreed to dismiss both of those patents. Therefore, the Court does not address the validity of the '715 and '719 patents.

converting from one specified medium (telephone voice calls) to a second specified medium (electronic chats)." ECF No. 134 at 20. But the claims completely fail to provide for any "specific means or method" to achieve this conversion. Clarilogic, 2017 WL 992528 at *2. For example, the claims do not explain how to check a chat server for accessibility of a calling party chat client, how to prompt a called party to select to talk or chat, or how to subsequently enable the electronic chat session. TDE Petroleum, 657 F. App'x at 993 (affirming the invalidity of claims that "recite the *what* of the invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible application") (emphases in original). Instead of claiming a specific way to convert voice calls to electronic chat, they attempt to claim the goal of conversion itself by describing generic computer equipment in broad, functional language—e.g., a "call processing system element operable to check a chat server for accessibility of a calling party chat client" and a "program performing the step[] of . . . prompting a called party to choose to either talk or electronically chat if the calling party chat client is accessible." ECF No. 126-5 at 11, 13. Again, "there is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general." Electric Power, 830 F.3d at 1356 (internal quotation marks omitted). The former spurs innovation, whereas the latter thwarts it. See Alice, 134 S. Ct. at 2354. The Court therefore proceeds to step two of the Alice inquiry.

The individual claim elements—receiving a telephone call request, checking whether the parties are able to communicate over chat, prompting one of the parties to choose whether they prefer to talk or chat, and subsequently initiating a chat session—represent routine human activity. Indeed, the patents admit that chat clients and telephones were both available in the prior art. ECF No. 126-4 at 11, 12 (describing one embodiment as including "a standard plain-old telephone system" and noting "an abundance of chat clients presently available that may be used in conjunction with the present invention"). The dependent claims, which recite sending a chat invitation or "connecting a voice call when the calling party chooses not to chat," similarly describe conventional human activity. Although the claims recite "[a] phone system," a "call processing system," "the internet," and "a computer readable medium," this kind of "wholly

generic computer implementation is not generally the sort of 'additional feature[]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" Alice, 134 S. Ct. at 2357-58; Mortg. Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1324 (Fed. Cir. 2016) (holding that there was no inventive concept where "the claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database'"). Moreover, "[b]ecause the system claim and method claim contain only 'minor differences in terminology but require performance of the same basic process,' they should rise or fall together." Accenture, 728 F.3d at 1344 (quoting Mayo, 132 S. Ct. at 1291).

24/7 contends that, "even if a 'telephone' and a 'chat client' were known in the art," the ordered combination is inventive because, "rather than checking for the called party's ability to receive a telephone call, it checks for the accessibility of a completely different medium: chat." ECF No. 134 at 21. Therefore, 24/7 argues, the claims "recite an inventive concept: converting a voice call to a chat session by checking for the availability of a communication medium different from that which was originally requested before prompting a selection between available communications mediums." Id. 24/7 further argues that "[t]here is no evidence that this concept was routine or conventional at the time of filing." Id.

Even if the concept of converting voice calls to chat was unconventional at the time of filing, "[a]n inventive concept . . . must be significantly more than the abstract idea itself." Bascom, 827 F.3d at 1349. As explained above, the claims merely recite the abstract idea of converting voice calls to chat, and they provide no specific way to implement this abstract idea. The relevant question is "[w]hat else is there in the claims before us" besides the patent-ineligible abstract idea itself? Alice, 134 S. Ct. at 2355 (quoting Mayo, 132 S. Ct. at 1297). When the abstract ideas are stripped away and the remaining claim elements are analyzed, both individually and as an ordered combination, it is clear that the claims fail to supply an inventive concept sufficient to transform the abstract idea into a patent-eligible application.

Lastly, the Court notes that the claims raise significant preemption concerns because they presumably cover any situation in which (1) one party receives a telephone call, (2) a party to the call checks to see whether the other party can access a chat client, (3) a party decides whether to

communicate via call or chat, and (4) a chat or call is initiated accordingly.

The Court grants the motion for judgment on the pleadings as to the invalidity of the '553 patent.

**F.   '209 Patent**

The '209 patent generally relates to a communication network that allows users on different types of devices to collaborate.  ECF No. 126-2 at 5.

Claim 1 provides:

> A method of initiating a communication session over a network said method comprising the steps of:
>
> > (a) receiving an identity of a called party and an identity of a collaborative application from a calling part[y], wherein the calling party participates in the communication session at a first endpoint and the called party participates in the communication session at a second endpoint;
> > (b) determining a first endpoint type and a second endpoint type;
> > (c) selecting a first version of the collaborative application based on the first endpoint type and a second version of the collaborative application based on the second endpoint type, said first version differing from said second version; and
> > (d) retrieving and making available the first version of the application to the calling party and the second version of the application to the called party.

Id. at 7.  Dependent claim 2 recites "[t]he method of claim 1, wherein step (d) comprises the step of: executing the first version and the second version."  Id.  Dependent claim 3 recites "[t]he method of claim 1, further comprising the step of: (e) storing collaborative activity of the called party and the calling party during the communication session."  Id.  Dependent claim 9 recites "[t]he method of claim 1, wherein the network comprises a Public Switched Telephone Network and an Internet."  Id.

Independent claim 18 provides:

> A method of collaborating on an application, said method comprising the steps of:
>
> > (a) receiving a request to establish a communication session

from a first user at a first endpoint, said request including an identity of a second user at a second endpoint;

(b) determining a first endpoint type and a second endpoint type;

(c) retrieving first version of the application based on the first endpoint type and a second version of the application based on second endpoint type, said first version differing from said second version;

(d) establishing the communication session between the first user and the second user, and

(e) executing the first version of the application so that it is available to the first user at the first endpoint and a second version of the application so that it is available to the second user at the second endpoint during the communication session.

Id. at 7-8.

These claims are directed to the abstract idea of providing an application to a user based on the type of device they are using so they can collaborate with another user who is using a different device on the same application. Like the other patents discussed above, however, the claims of the '209 patent do not provide any "specific means or method" for how to achieve this result. Clarilogic, 2017 WL 992528 at *2; TDE Petroleum, 657 F. App'x at 993 (affirming the invalidity of claims that "recite the *what* of the invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible application") (emphases in original). Because the claims are directed to the abstract idea of a collaborative application system, rather than a concrete means to implement that abstract idea, the Court proceeds to step two of the Alice inquiry.

24/7 argues that the claims are "directed to an inventive concept: a specific method for facilitating the use of collaborative applications by multiple remote parties." ECF No. 134 at 24. 24/7 further argues that "[t]he specification describes a technological solution that hosts different versions of collaborative applications on network servers and provides these applications to users by determining endpoint types in real time." Id. 24/7 contends that this was an improvement over the prior art, which required "specialized hardware and software." Id.

As explained above, the claims do not describe a specific method for achieving the goal of providing collaborative applications for users of different devices. See Affinity Labs of Texas, LLC v. DIRECTV, LLC, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that a patent was directed

24

to an abstract idea where it "claim[ed] the function of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function," and noting that "[t]here is nothing in claim 1 that is directed to *how* to implement out-of-region broadcasting on a cellular telephone") (emphasis in original). The specification similarly describes this abstract idea "at a high level of generality." Id. at 1259. Therefore, "[e]ven if all the details contained in the specification were imported into the [] claims, the result would still not be a concrete implementation of the abstract idea." Id. In any event, "the important inquiry for a § 101 analysis is to look to the claim," and "the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." Accenture, 728 F.3d at 1345. Here, the elements of the '209 patent claims do not contain any concrete, technological limitations. In fact, the specification admits that the purpose of the alleged invention was to do away with the need for "specialized software and/or hardware." ECF No. 126-2 at 5, 1:19-35, 1:58-59.

As a result, these claims are distinguishable from the claims at issue in Bascom and Amdocs, which described specific architectural improvements to the prior art. See Bascom, 827 F.3d at 1344-45 (instructing the practitioner to physically install the filtering system at the ISP server); Amdocs, 841 F.3d at 1301 (distinguishing claims that "merely combine the components in a generic manner" from claims that "purposefully arrange[] the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks").

Instead, these claims are more akin to one of the claims at issue in Open Text. Like 24/7, the plaintiff in that case "smuggle[d] in a reference to a 'network server.'" 78 F. Supp. 3d at 1047. However, the court nonetheless concluded that, "[s]horn of its implementation-specific fleece, the claim is directed at providing a method for people to collaborate and share information without the need for specialized software or expertise." Open Text, 78 F. Supp. 3d at 1047.

Nor do the claims contain any inventive concept sufficient to transform that abstract idea into a patent-eligible application. When viewed individually, each of the claim elements recite conventional activity, such as receiving a request to establish a communication session,

25

identifying a called party, determining what kind of device is being used, executing an unspecified application, and storing information. The addition of generic computer components, such as a "network," an "application," and the "Internet," also fails to transform an abstract idea into a patent-eligible application. See Mortg. Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (finding no inventive concept where "the claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database'"). Collectively, the claim elements describe the abstract idea of providing a collaborative application for users of different devices, but the inventive concept "must be significantly more than the abstract idea itself." Bascom, 827 F.3d at 1349.

Finally, by claiming the solution itself, rather than a concrete embodiment of a solution, the claims also raise significant preemption concerns. 24/7 argues that "claim 1 is limited to solutions that receive an identity of a called party and an identity of a collaborative application, determine the types of devices being used by the calling party and the called party, select two different versions of the collaborative application based on the types of devices, and retrieve and make available those versions of the application to the respective parties." ECF No. 134 at 25. However, *any* potential solution to the problem identified—i.e., the need to "facilitate[] application collaboration between users across a network using diverse types of devices"—would necessarily implicate these generalized, result-focused steps. ECF No. 126-2 at 5, 1:33-35.

The Court therefore grants the motion for judgment on the pleadings as to the invalidity of the '209 patent.

### G. '804 and '599 Patents[8]

The '804 and '599 patents generally relate to enhanced management of customer-agent interactions. ECF No. 126-11 at 10, 1:15-18 ("[T]he invention relates to enhancing the customer experience when the customer is using a multi-mode online or voice interaction solution."); ECF No. 126-10 at 9, 1:14-17 (same).

Claim 1 of the '804 patent is representative and provides:

_____

[8] Both parties discuss these two patents simultaneously. See ECF No. 126 at 27-31; See ECF No. 134 at 25-30.

Apparatus for management of online customer/agent interaction across multiple channels, comprising:

> a processor implemented interaction engine that is configured for accessibility by at least one customer and at least one agent for interaction during a session between said at least one customer and said at least one agent via any of chat, voice, and a combination of chat and voice as the mode of interaction;

> said interaction engine configured to send a link to said customer at said agent's request to allow said customer to access an application at a processor implemented application server on which said application is resident and to which said link is resolved for customer access to, and launching of, said application; and

> said interaction engine configured to allow said agent to proactively monitor progress of the customer while the customer is using said application.

ECF No. 126-11 at 13.[9]

Contrary to LivePerson's contention, the claims are not directed to the abstract idea of "providing customer service by an agent 'online.'" ECF No. 126 at 28. Because "[v]irtually every invention could be described at a high level in a few words," courts addressing invalidity under <u>Alice</u> "must scrutinize reductive descriptions with great care." <u>Verint Sys. Inc. v. Red Box Recorders Ltd.</u>, No. 14-CV-5403 (KBF), 2016 WL 7156768, at *1 (S.D.N.Y. Dec. 7, 2016). Here, LivePerson's reductionist description of the invention obscures key claim limitations, which go beyond merely engaging with customers or "monitoring the status of a call." <u>Cf</u>. <u>Open Text</u>, 2014 WL 4684429 at *4; <u>Telinit Techs., LLC v. Alteva, Inc.</u>, No. 2:14-CV-369, 2015 WL 5578604, at *16 (E.D. Tex. Sept. 21, 2015). Although the claims *involve* the abstract idea of enhancing customer service in an online customer-agent interaction, they are ultimately directed to a specific means or method for achieving that goal: sending a link to a customer who, in turn, uses that link to launch an application, at which point the agent can monitor the customer's progress in real time while the customer is using the application. Thus, the claims pass muster under step one of the

---

[9] Independent claim 16 of the '804 patent is substantially similar. <u>See id.</u> Claim 1 of the '599 patent is also similar, but contains some additional limitations, which are discussed at length below. <u>See</u> ECF No. 126-10 at 12-13.

Alice inquiry.

Moreover, even if the claims were directed to an abstract idea, they nonetheless contain an inventive concept sufficient to transform the abstract idea into a patent-eligible application. The elements of the '804 and '599 patents, when viewed as an ordered combination, contemplate a specific method and apparatus that allows an agent to proactively monitor the customer's activity as the customer navigates through an application. Nothing in the specification suggests that prior art technology was able to predict and address a customer's potential issues in such a way. See ECF No. 126-10 at 9, 1:18-51. To the contrary, the specification suggests that this was a technological improvement over prior chat interaction technology, which often required the customer to "first try to solve the issue using a self service application or a social networking means and, if unsuccessful, then the customer can contact an agent using a suitable means . . ." Id. at 1:24-29. This created the following problem: "[W]hen an agent talks to a customer, either on the phone or using a chat solution, the agent is generally not aware of most of the steps taken by the customer to resolve issues the customer faces, prior to the current conversation. So, the agent may repeat instructions and solutions, which may have already been tried by the customer." Id. at 1:32-37. The '804 and '599 patents provide "an unconventional technological solution" to this problem by allowing the agent to simultaneously provide customer support and monitor the customer's activity. Amdocs, 841 F.3d at 1300. Courts have upheld the validity of similar patents that "provid[e] an audit trail of significant on screen events" through synchronized monitoring of call center customer interactions. Verint Sys. Inc. v. Red Box Recorders Ltd., No. 14-CV-5403 (KBF), 2016 WL 7156768, at *10-*11 (S.D.N.Y. Dec. 7, 2016) (internal quotation marks omitted) (noting that the claim at issue was "far more than just a generic method of monitoring").

Additional claim limitations also supply inventive concepts. For example, claim 1 of the '599 patent contemplates "an alerting module configured for monitoring a journey of the customer through an application and raising alerts to the agent based on triggering points/events." ECF No. 126-10 at 13. The specification explains that these alerts are triggered by pre-defined events, such as customer inactivity for a specified amount of time and/or error messages as the customer navigates the application. Id. at 2:55-3:7. Again, nothing in the specification suggests that

monitoring customer activity or inactivity in this way is routine or conventional. To the contrary, the specification states that "[c]urrently, when customers of a company face any issues with respect to a service or product, the customers tend to contact customer service representatives . . . " ECF No. 126-10 at 9, 1:19-21. This claim element improves upon the prior art by providing the agent with sufficient information—either through monitoring or an automatically-generated alert—such that the agent can proactively re-initiate a session when it appears that the user might require assistance. That claim also describes "an automation module configured for leveraging predictive technologies to pre-populate any of an interaction summary and disposition form." Id. The specification explains one particular embodiment of such "predictive technologies" as employing "transcription, text mining models, and problem and response prediction models that identify the problem based on the first few dialogs or lines of typed text . . ." ECF No. 126-10 at 11, 5:36-64. This element improves on the prior art by "mak[ing] data collection far more accurate and efficient . . ." Id. And, because this element provides "the added value of having a categorization system that grows and improves in its ability to do its job, based on the consistent incorporation of new information," it also supplies an inventive concept. Yodlee, 2016 WL 2982503 at *28. In sum, the "overall ordered combination of all of the limitations [is] unconventional." Amdocs, 841 F.3d at 1304. This is true even though "some of the components and functions may appear generic." Id.

Therefore, the Court denies the motion for judgment on the pleadings as to the invalidity of the '804 and '599 patents.

## CONCLUSION

The Court grants the motion for judgment on the pleadings as to the invalidity of the '876, '586, '552, '757, '553, and '209 patents. The Court denies the motion for judgment on the pleadings as to the invalidity of the '804 and '599 patents.

IT IS SO ORDERED.

Dated: May 25, 2017

_____
JON S. TIGAR
United States District Judge